**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **CANDICE BAIRD,** | : | **CASE No. 1:16-cv-759** |
| Plaintiff, | : | Judge Susan J. Dlott |
| vs. | : | |
| **HAMILTON COUNTY** | : | |
| **DEPARTMENT OF JOB AND** | | |
| **FAMILY SERVICES, et al.** | : | |
| | : | |

**DEFENDANTS' AMENDED REPLY TO PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[1]**

Now come all Defendants in all capacities named, and hereby offer their reply to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment.

Respectfully submitted,

JOSEPH T. DETERS
PROSECUTING ATTORNEY
HAMILTON COUNTY, OHIO

*/s/ Kathleen H. Bailey*
Kathleen H. Bailey, 0059660
Jerome A. Kunkel, 0039562
Jay Wampler, 0095219
Assistant Prosecuting Attorneys
Hamilton County, Ohio
230 E. Ninth Street, Suite 4000
Cincinnati, OH 45202
DDN: (513) 946-3289 Bailey
DDN: (513) 946-3103 Kunkel
DEFENDANTS' TRIAL ATTORNEYS

---

1 This Amended Reply is being filed by order of the Court following a re-filing of all deposition exhibits. In accordance with agreement of counsel and the Court, no substantive changes were made to this Reply. Substitution of the new PageID numbers resulted in a Reply that is 21 pages versus the original 20 pages.

**ARGUMENT**

**III.A. HCJFS is Not *Sui Juris***

Defendant HCJFS moved for a dismissal from this lawsuit because it is not *sui juris*. Plaintiff did not oppose the motion. The motion is well-taken and should be granted.

**B. Claims Against Defendant Chris Biersack in Individual Capacity Must Be Dismissed**

Defendant Biersack moved for a dismissal of all claims against him in his individual capacity under Fed.R.Civ.P. 12(b)(6) because he did not authorize or issue Plaintiff's suspension or termination. Plaintiff did not oppose the motion; it is well-taken and should be granted.

**D. Plaintiff Was Not Retaliated Against in Violation of the First Amendment**

**1. Constitutionally Protected Activity**

To prove a First Amendment retaliation claim Plaintiff must prove: (1) she spoke on a matter of public concern; (2) she spoke as a private citizen; and (3) that her speech interest outweighs Defendants' interest, as her employer, in promoting the efficiency of the public services it performs through its employees. *Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456 (6th Cir.2017). The determination as to whether speech is protected is one of law, and Plaintiff's claims under both the Petition Clause and the Speech Clause must be decided using the same analysis. *Id.* at 464.; *Borough of Duryea, Pa. v. Guarnieri,* 564 U.S. 379, 398-399 (2011); *Valot v. Southeast Local Sch. Dist. Bd. of Educ.*, 107 F.2d 1220, 1226 (6th Cir.1997).

**a. Matter of Public Concern**

**i. 10-Day Suspension**

Plaintiff argues that her speech is a matter of public concern because (1) it took place in a judicial proceeding, and (2) it raised significant questions of overreach and government misconduct.

Plaintiff claims that in *Lane v. Franks* "the Supreme Court unequivocally held that truthful testimony under oath in a judicial proceeding by a public employee outside of his ordinary job duties is speech by a citizen **on a matter of public concern**." (Doc. 54, Memo. in Opp. at PageID 2480)(emphasis added). The quoted language, minus the emphasized language, is the holding in *Lane v. Franks*, 134 S.Ct. at 2378. The Supreme Court unequivocally <u>did not</u> hold that speech in a judicial proceeding is speech on a matter of public concern simply because it takes place under oath in such a setting. Once the Court in *Lane v. Franks* determined that truthful testimony under oath in a judicial proceeding by a public employee outside of his ordinary job duties is speech as a citizen (a point Defendants conceded at page 12 of their MSJ), the Court then considered the **<u>content</u>** of Lane's testimony to determine whether it addressed a matter of public concern.

According to Plaintiff, because the state dedicates substantial resources to the custody and wellbeing of the children of Hamilton County, all speech of any kind, even that made in a personal custody petition, must be a matter of public concern. There is no case Plaintiff can cite in support of this position. It is simply not the law that all speech made in a judicial proceeding, or all speech made regarding a subject the state devotes resources to, is automatically a matter of public concern. As the Supreme Court stated in *Connick v. Myers,* "[t]o presume that all matters which transpire within a government office are of public concern would mean that virtually every remark…would plant the seed of a constitutional case", and the Court declined to so hold. *Id.*, 46 U.S. at 149. Rather, a court must consider the content of the specific speech to determine whether it was a matter of public concern.

According to Plaintiff, in her petition for custody of her granddaughter she accused HCJFS of obtaining custody in violation of Ohio law, and her testimony was highly critical of

the manner in which HCJFS and its officials discharged their governmental duties.  (Doc. 54, Memo. in Opp. at PageID 2484).  Plaintiff's couching her petition and testimony in this manner is an astounding display of attempted revisionist history.

On Plaintiff's Petition for Custody she stated "HCJFS filed for Emergency Custody but have not provided reason", and "HCJFS filed for emergency prior to seeking family.  It is in the best interest of Natalie (the child) to be in the care of family particularly who she knows."  (Doc. 51-10, Ex. 15 at PageID 2007).  Nothing about this language suggests a violation of Ohio law or was particularly critical of HCJFS.  Furthermore, there is no evidence in the record that any decision-maker at HCJFS saw this petition or knew of its contents. Mary Eck, who instituted discipline against Plaintiff, testified that concerns were initially brought to her by Ms. Cole and Ms. Cole's supervisor, and she considered those concerns and Plaintiff's Day One Hearing testimony; Ms. Eck could not recall if she also reviewed the SACWIS entries. (Doc. 26, Eck Depo. at PageID 420-422). Nowhere in the record is there any mention or evidence that Ms. Eck or any other decision-maker reviewed or considered Plaintiff's Petition for Custody.  When the Magistrate Judge discussed Plaintiff's petition at the Day One Hearing she only mentioned it was a "petition for custody", with no comment whatsoever made as to the language therein.  (Doc. 51-6, Ex. 7 at PageID 1788, 1790-1791).

Plaintiff's testimony at the Day One Hearing lasted 55 pages.  (Doc. 51-6, Ex. 7 at PageID 1879-1934).  Of those 55 pages, on only three (3) does Plaintiff's testimony touch on the language cited above, and on anything that could even remotely be considered "critical" of HCJFS.  At PageID 1927 Plaintiff states "I mean, I don't know what happened from the 1st to the 11th that they would knock on my door at 7:00 at night, not giving us any reason why they're taking the baby out of my home."  At PageID 1933 to 1934 Plaintiff states:

> When they showed up at 7:00 at night, they couldn't give us a single reason why they were there.  They said they don't know why.  And it's just—I mean the Safety Plan was put in place, it was being followed.  I don't—I didn't see the need for an emergency removal.  I don't see the need where Samantha wouldn't have to lose custody of her baby.  There's plenty of other families where services are put in place for concerns, but I don't know what the emergency was on Friday.

That is it.  Not one other word uttered allegedly critical of HCJFS, and certainly no allegation made that HCJFS had violated Ohio law, which Plaintiff now for the very first time in her Memorandum in Opposition asserts.  Plaintiff did not even make such an allegation in her Amended Complaint. The absolute only words Plaintiff uttered therein regarding the petition for custody and her testimony in support thereof (other than general language appearing in the Statement of Claims) appear in paragraph 21 wherein she states:

> Ms. Baird filed a petition on her own behalf asking the Juvenile Court to transfer custody from HCJFS to herself.  In the ensuing custody hearing, and while under oath, Ms. Baird testified to, among other things, that she did not believe that her son posed a threat of harm to the child, that she had no concerns about the child's mother protecting the child from the father, and that her son's psychiatrist had stated that she had no concerns about her son caring for the child.  (Doc. 13 at PageID 59).

When asked in her deposition to explain why she filed the Petition for Custody Plaintiff stated that she did not know why HCJFS took custody of Natalie and she wanted to be at the Day One Hearing to find out the reasons, and to be available to take custody herself.  (Doc. 24, Baird Depo.1 at PageID 326-328).  She did not believe she would be allowed to be present in what she believed was an otherwise closed hearing unless she filed the petition.  (Id. at 327).  Notably, Plaintiff said not one word about filing the petition because HCJFS violated some state law.  The only testimony Plaintiff gave on this subject was that she believed "policies" required that HCJFS should have had a conversation with Samantha outlining its concerns before it took custody of Natalie, but acknowledged that the "agency can do whatever they want to do."  (Id. at 331).

There is nothing in Plaintiff's petition nor in her Day One Hearing testimony that would have alerted Defendants that Plaintiff was launching some kind of accusation that HCJFS had violated Ohio law. If there is no evidence that at the time of Plaintiff's suspension any Defendant recognized Plaintiff's petition or speech as a protest or critical of HCJFS, it simply cannot be proven Defendants retaliated against her for exercising her First Amendment rights.

Citing *Connick,* Plaintiff argues that a public employee's speech does not have to exclusively pertain to matters of public concern, it is enough that a largely private matter also touches on matters of public concern. In *Connick*, the plaintiff was terminated for distributing a questionnaire to other employees concerning office transfer policy. *Id.*, 461 U.S at 138. The Court determined that "[b]ecause one of the questions in Myers' survey touched upon a matter of public concern, and contributed to her discharge we must determine whether Connick was justified in discharging Myers." *Id.* at 149 (emphasis added). The underlined language is important, as there is no evidence that Plaintiff's alleged "criticism", at best spanning three pages in her 55-page testimony, contributed to her suspension. Plaintiff was suspended only for providing testimony that conflicted with what she had told Ms. Cole during the investigation and for minimizing Chico's threat to Natalie. (Doc. 52-15, Ex. 26 at PageID 2247).

Furthermore, Plaintiff's claim that HCJFS violated Ohio law, as raised for the first time in her Memorandum in Opposition, is baseless. Plaintiff alleges:

> Under Ohio law, the government is required to notify the custodians of a child before seeking an *ex parte* emergency order to remove a child. Ohio.Rev.Code § 2151.31(D) provides in pertinent part:
>
>> A juvenile judge or referee shall not grant an emergency order by telephone pursuant to this division until after the judge or referee determines that reasonable efforts have been made to notify the parents, guardian, or custodian of the child that the child may be placed into shelter care… (Doc. 54, Memo. in Opp. at PageID 2483).

6

Plaintiff failed to cite the last, and most important for purposes of this issue, part of R.C. § 2151.31(D); here is what appears in the "…" that Plaintiff omitted:

> …except that, if the requirement for notification would jeopardize the physical or emotional safety of the child or result in the child being removed from the court's jurisdiction, the judge or referee may issue the order for taking the child into custody and placing the child into shelter care prior to giving notice to the parents, guardian, or custodian of the child.

This is exactly the exception HCJFS utilized in seeking the *ex parte* order. As stated in SACWIS "Magistrate Coleman was informed that the family did not know of the emergency order of custody as it did not appear to be in the best interest of the child at the time." (Doc. 51-4, Ex. 3 at PageID 1737). As Ms. Cole testified, she feared that Chico would hurt Natalie if he learned that there was going to be an order to remove the child from the home, and she "not willing to put that child…at risk."[2] (Doc. 27, Cole Depo. at PageID 518-519). Following extensive testimony, the Court agreed:

> Based upon the evidence presented, the court finds there are reasonable grounds to believe that Natalie [] was in immediate danger from her surroundings and that her removal was necessary to prevent immediate or threatened physical or emotional harm. While it is obvious that the paternal grandmother [Plaintiff] cares deeply for her son and her granddaughter, it is clear that her minimization of her son's mental illness and propensity for violence make her unable to adequately protect the child at this time. (Doc. 51-11, Ex. 21 at PageID 2052).

Further, there is no Ohio law that requires HCJFS to provide a reason for removal of a child at the time an Emergency Order is executed. Nevertheless, the evidence proves that when

---

2 In Plaintiff's Proposed Disputed Fact #4 she scurriously claims Ms. Cole obtained the *ex parte* order in contravention of the law, and that she intentionally waited to petition the Court until after it was closed to deprive Natalie's family of their lawful opportunity to be heard. Neither of the citations she provides in support of this outlandish allegation even remotely supports it. Further, at PageID 2473 of Plaintiff's Memorandum in Opposition Plaintiff claims Ms. Cole lied by telling the Magistrate that reasonable efforts had been made to notify the family of the filing of the Emergency Order. First, a review of the testimony cited by Plaintiff (Doc. 27, Cole Depo. at PageID 526) shows there is nothing on that page about Magistrate Coleman; second, at PageID 524-525 Plaintiff's counsel literally had an "oh" moment when Ms. Cole explained that the entry meant only that reasonable efforts were made to notify the family of the hearing the following Monday, which was entirely true. Yet, despite this revelation, Plaintiff introduces this to unfairly impugn Ms. Cole's character.

caseworkers arrived to take custody of Natalie on March 11th they explained to both Plaintiff and Samantha that "there are concerns for father Chico's [] mental health functioning, history of violence, and the family's ability to control those threats." (Doc. 51-4, Ex. 3 at PageID 1738). Plaintiff's refusal to acknowledge, or inability to comprehend, the reason for the Emergency Order does not mean the reason was not given. Plaintiff further stated in her petition that HCJFS filed for emergency prior to seeking family, but Natalie was placed with family the night the order was executed. (Id. at PageID 1739).

Plaintiff goes to great lengths to couch her Day One testimony as generally bringing "accusations" against HCJFS, and "speech alleging government misconduct", in order for this Court to find her petition and speech raised issues of public concern, but a fair reading of her testimony proves it was purely personal. Plaintiff claims her cross-examination of Ms. Cole accused her of providing false testimony. (Doc. 54, Memo. in Opp. at PageID 2483). A cursory review of the testimony proves Plaintiff was simply disagreeing with Ms. Cole's conclusions. (See Doc. 51-6, Ex. 7 at PageID 1860-1863). There was no "accusation" of "providing false testimony". Plaintiff then claims that "she pointedly accused HCJFS of misconduct for taking Natalie from the custody of Ms. Cruz and suggested that her family was treated differently than other families." (Doc. 54, Memo. in Opp. at PageID 2483). The language she quotes in her Memorandum does not include any such accusation of misconduct; it simply shows Plaintiff's inability to accept and/or understand the reasons for the Emergency Order in her own personal situation involving her granddaughter, and her frustration in that regard. (Id. at PageID 2484). Her testimony was not an indictment of the process, it was simply Plaintiff's discontent over her personal situation.

Plaintiff's testimony was not "highly critical of the manner in which HCJFS and its officials discharged their governmental duties"; rather, her testimony was as she summarized it in her Amended Complaint, nothing more than her expressing that she did not believe her son posed a threat to the child, and she believed Samantha could protect the child.  (Doc. 13, Amended Complaint, at ¶ 21). It was not until the Memorandum in Opposition that Plaintiff decided to claim her testimony was critical of HCJFS.  Furthermore, there is not a scintilla of evidence in the record that any decision-maker at any time recognized Plaintiff's speech as being critical of HCJFS.

Plaintiff claims that the separation of children from their parents, i.e., immigrant children at the border, has generated public debate, *ipso facto*, all speech regarding custody is a public concern.  (Doc. 54, Memo. in Opp. at PageID 2484, fn 5).  This argument has been specifically rejected by the Sixth Circuit.  *See Nair v. Oakland County Community Mental Health Authority*, 443 F.3d 469, 479 (2006) ("Any connection the letter has with the public interest is incidental and arises only because Nair's job dealt with public health, which in a general sense concerns the public."); *Rahn v. Drake Center Inc.,* 31 F.3d 407, 414 (1994) ("In almost every public employee case brought under the First Amendment, the employee could contend that the public might wish to air [its] views on the goals of any public institution.").

When a public employee speaks "upon matters only of personal interest," the communication is not protected under the First Amendment. *Connick* at 147.  Such is the case with Plaintiff's petition and testimony.  By her own admission, Plaintiff filed the petition and testified to find out why HCJFS filed an Emergency Order, and to be available to take custody if the court so ordered.  The public has no interest in Plaintiff's personal petition for custody of her granddaughter.  Plaintiff's claims that her petition and testimony raised issues of public concern

because they were critical of HCJFS are not supported by the record. Further, Plaintiff's suggestion at Doc. 54, Memo. in Opp. at PageID 2482 that *Borough of Duryea, Pa. v. Guarnieri* grants her some greater protection under the Petition Clause is specifically refuted by the holding of that very case, in which the Court rejects that assertion and requires that claims under the Petition and Speech Clauses be considered in the same manner. *See Guarnieri*, 564 U.S. at 398.

### ii. Termination

To prevail Plaintiff must prove the employment lawsuit she filed was a matter of public concern, but she makes no attempt to do so. Plaintiff literally makes no argument that the lawsuit was a matter of public concern. Instead, she vaguely claims that, but for the suspension, she would not have been terminated. That is not the law. Plaintiff carries the burden of proving that Defendants violated the First Amendment by terminating her, and she did not even try. Merely including a First Amendment claim in a lawsuit does not transform it into a matter of public concern. *Singer v. Ferro*, 711 F.3d 334, 336 (2nd Cir.2013).

### c. Balancing of Plaintiff's Interest Outweighed by Defendants' Interest in Efficiency

Plaintiff argues that Defendants must prove that Plaintiff knowingly or recklessly made false statements. Even assuming *arguendo* Plaintiff's "criticism" of HCJFS rose to the level of a public concern, there is no evidence that she was suspended for those statements. Plaintiff was suspended for changing her story three times regarding her son's history of domestic violence, and for minimizing her son's threat to his daughter. This "speech" for which she was suspended was not a public concern, so Defendants bear no burden to prove the statements were falsely made knowingly or recklessly. As the Court stated in *Connick*, 461 U.S. at 146-147, "[p]erhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissal from government service which violate no fixed tenure or applicable statute or regulation are not

subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable."

Because the "speech" for which Plaintiff was suspended did not rise to the level of a public concern, this Court's inquiry should end.  Nonetheless, Defendants are compelled to dispel Plaintiff's blatant distortion of the record.  Plaintiff's entire argument is based on her faulty premise that she was suspended only for statements made at the Day One Hearing.  The suspension order itself is not so narrow, and that and the pre-disciplinary hearing officer's report make clear that Plaintiff's suspension emanated from her conduct and statements during the investigation, the hearing, and the pre-disciplinary conference. (Doc. 52-15, Ex. 26 at PageID 2224, 2229-2246).  Plaintiff's behavior and statements made throughout the investigation, as well as during the Day One Hearing, were scrutinized during her pre-disciplinary conference, and Plaintiff's attorney defended her on both.  (Id; Doc. 52-29, Ex. 41 at PageID 2295 [CD delivered to Chambers with original MSJ]).

Regarding dishonesty, Defendants have no way of knowing if Plaintiff was dishonest to the investigator, at the Day One Hearing, or during her pre-disciplinary hearing, but she told three different stories at each one regarding whether or not she told the investigator about her son's prior domestic violence.  In response to Ms. Cole's direct questioning Plaintiff denied any history of domestic violence and/or substance abuse by Chico, despite her knowledge that there was a long history of both. (Doc. 24, Baird Depo. 1 at PageID 251-254; Doc. 27, Cole Depo. at PageID 495-497, 499-501, 507; Doc. 51-4, Ex. 3 at PageID 1736; Doc. 51-6, Ex. 7 at PageID 1904-1906; Doc. 52-13, Ex. 24 at PageID 2184). At the Day One Hearing Plaintiff claimed Ms. Cole never asked her about Chico's prior domestic violence, and then was elusive regarding that history, and seemed to minimize it, or at the very least not be forthright and honest. (Doc. 51-6,

Ex. 7 at PageID 1904-1907; Doc. 26, Eck Depo. at PageID 410-412). At the pre-disciplinary hearing Plaintiff claimed she *did* tell Ms. Cole about the prior incidents of domestic violence. (Doc. 52-15, Ex. 26 at PageID 2039; Doc. 52-29, Ex. 41 at PageID 2295 [CD delivered to Chambers with original MSJ]; Doc. 24, Baird Depo. 1 at PageID 302). As the pre-disciplinary hearing officer found, "Ms. Baird either perjured herself before the Court or misrepresented facts to the investigator (and this Hearing Officer) during interview and subsequent conference." (Doc. 52-15, Ex. 26 at PageID 2243).

Plaintiff was also suspended for minimizing her son's violent and out of control behavior on March 1, 2016. (Doc. 52-15, Ex. 26 at PageID 2247). Mobile Crisis called 241-KIDS on that date because of concern for Natalie's safety given what was found in Chico's apartment, including finding Chico making suicidal statements, crying and upset, an empty bottle of alcohol, destroyed property as evidenced by broken wooden pieces strewn all over the apartment/living room believed to be from furniture, the cable box was on the ground, the phone had been pulled from the wall and was inoperable, Chico's hand was bleeding and there were drops of blood on the floor and in the hallway of the building. (Doc. 51-3, Ex. 2 at Page ID 1704; Doc. 32, Toulson Dec. at PageID 1253, Tracks 1 and 7). Ms. Cole's independent observations confirmed this report. (Doc. 51-4, Ex. 3 at PageID 1736; Doc. 27, Cole Depo. at PageID 501-503, 511). Yet, throughout the investigation and the Day One Hearing Plaintiff minimized Chico's behavior and denied Mobile Crisis's findings.[3] (Doc. 51-4, Ex. 3 at PageID 1734; Doc. 51-6, Ex. 7 at PageID 1811, 1914; Doc. 27, Cole Depo. at PageID 506, 521).

---

3 At paragraph 19 in Plaintiff's RPUF she alleges Mr. Biersack, HCJFS's HR representative, admitted Mobile Crisis's report that there was wood strewn about the apartment sounded exaggerated. That is a gross mischaracterization of Mr. Biersack's testimony. Plaintiff's counsel said to Mr. Biersack "Mobile Crisis said there were thousands of pieces of wood", and Mr. Biersack agreed that sounded exaggerated. (Doc. 20, Biersack Depo. at PageID 110-111). However, Mobile Crisis only reported "broken wood pieces strewn all over the apartment/living room", and that is what was memorialized in the SACWIS notes. (Doc. 32, Toulson Dec., CD Track 1 at PageID 1253; Doc. 51-3, Ex. 2 at PageID 1704). "Thousands" came from Mr. Butler alone.

Plaintiff claims Defendants struggled to identify Plaintiff's false testimony at the hearing. She claims, for example, that Mr. Biersack testified that he "didn't see perjury." (Doc. 54, Memo. in Opp. at PageID 2486). What Mr. Biersack actually said was "I didn't see perjury because I didn't know enough about the situation to make that argument." (Doc. 20, Biersack Depo., at PageID 140). As Mr. Biersack explained, he did not know enough about the investigation to know at that time if Plaintiff's testimony at the Day One Hearing was contradictory to statements she made during the investigation. (Id.). Regarding Ms. Lang and Ms. Eck, Plaintiff claims both struggled to identify anything in her testimony that was false. Plaintiff was suspended in part because her Day One testimony conflicted with what she told Ms. Cole. Ms. Lang and Ms. Eck listened (Lang was present, Eck listened to the CD) as during the Day One Hearing Ms. Cole explained her investigation and: (1) reported the condition of Chico's apartment as reported by Mobile Crisis to 241-KIDS, which proved Chico's violent outburst (Doc. 51-6, Ex. 7 at PageID 908-1802-1803); (2) provided her observations during her on-site visit that confirmed Mobile Crisis's report (Id. at 1804-1805); (3) explained how Plaintiff minimized the events of March 1 (Id. at 1811); and (4) explained that she specifically asked Plaintiff about a prior history of domestic violence or substance abuse, and that Plaintiff denied both (Id. at 1813-1814). Plaintiff testified after Ms. Cole, and Ms. Lang and Ms. Eck listened as Plaintiff: (1) claimed Ms. Cole never asked her about Chico's prior domestic violence (Id. at 1907); (2) minimized the seriousness of the events of March 1 (Id. at 1893, 1903, 1913, 1922-1926); and (3) claimed Mobile Crisis's version about the condition of Chico and his apartment on that date was incorrect (Id. at 1914). Ms. Lang's and Ms. Eck's testimony at their depositions merely shows the difficulty each had 18 months-removed from Plaintiff's Day One testimony in attempting to explain the impressions each had *as they listened to and considered that testimony*.

(See Doc. 43, Lang Depo., at PageID 1577-1582, 1590-1591; Doc. 26, Eck Depo. at PageID 407-419).

Plaintiff argues Defendants could not rely on Ms. Cole's testimony because she allegedly provided "false testimony" at her deposition. Obviously, Ms. Cole had not yet provided this alleged false testimony at the time Defendants suspended Plaintiff. Ms. Cole's testimony at the Day One Hearing was wholly consistent with her SACWIS notes, and wholly consistent with Mobile Crisis's report to 241-KIDS. Defendants had no reason to doubt the veracity of statements made by an objective Mobile Crisis worker, and an objective investigator. More importantly, Plaintiff's explanation of Ms. Cole's testimony is itself false. Ms. Cole testified she was not entirely sure when she created the March 11 entry. (Doc. 27, Cole Depo., at PageID 494-495). Furthermore, Plaintiff's claim that the law requires the notes be entered within 24 hours is false. As Ms. Eck explained, the Ohio Administrative Code allows for a longer period of time, and even if Ms. Cole entered her notes in SACWIS 11 days after the meeting, it is clear Ms. Cole had taken copious written notes of that meeting, proving their accuracy. (Doc. 26, Eck Depo. at PageID 399-402; Doc. 51-4, Ex. 3 at Page ID 1733-1736).

Contrary to Plaintiff's assertion that Defendants were required to prove Plaintiff "knowingly and recklessly" made false statements[4], Defendants are required to prove only that a reasonable official could believe that Plaintiff knowingly or recklessly made false statements. *Gossman v. Allen*, 950 F.2d 338, 342 (1991). Clearly the Chief Magistrate presiding over the Day One Hearing, presumably a reasonable official, believed Plaintiff was not being honest about the events of March 1, and was minimizing her son's danger to Natalie, the two reasons for Plaintiff's suspension:

---

4 Again, the testimony for which Plaintiff was suspended had nothing to do with what she now claims was protected speech (criticism of HCJFS), so Defendants have no burden to prove the statements were falsely made knowingly or recklessly.

While it is obvious that paternal grandmother (Baird) cares deeply for her son and granddaughter, it is clear that her minimization of her son's mental illness and propensity for violence make her unable to adequately protect the child at this time.  Both mother and paternal grandmother lack the judgment and protective capacity to ensure that Natalie is safe at all times and that father's contact with the child does not place the [sic] Natalie at risk for physical or emotional harm.  Paternal grandmother maintained that she over-reacted by calling mobile crisis and concluded the events of March 1, 2016, were simply the result of a misunderstanding.  (Doc. 51-11, Ex. 21 at PageID 2052).

Even if Defendants' understanding of Plaintiff's testimony was in some way incorrect, Defendants still prevail as long as Defendants actions were reasonable.  "The Connick test should be applied to what the government employer reasonably thought was said, not to what the trier of fact ultimately determines to have been said." *Waters v. Churchill*, 511 U.S. 661, (1994). As the Supreme Court stated:

[T]here will often be situations in which reasonable employers would disagree about who is to be believed, or how much investigation needs to be done, or how much evidence is needed to come to a particular conclusion.  In those situations, many different courses of action will necessarily be reasonable.  Only procedures outside the range of what a reasonable manager would use may be condemned as unreasonable.
* * *
We have never held that it is a violation of the Constitution for a government employer to discharge an employee based on substantially incorrect information. *Id.* at 678-679.

### **Balancing of Plaintiff's Interest Outweighed by Defendants' Interest in Efficiency**

Plaintiff's argument that her dishonesty and minimization of her son's threat to his child did not reflect poor judgment that impaired the operation of HCJFS has no merit factually or legally. Even though Plaintiff was testifying at the Day One Hearing on a personal matter, her testimony reflected on HCJFS and undermined Plaintiff's credibility as a Family Services Supervisor.  (Doc. 26, Eck Depo. at PageID 419-420).  It was Plaintiff's responsibility to provide direction to staff and to assess safety of children at substantial risk of neglect or abuse, yet Plaintiff minimized obvious risk to her own granddaughter.  Plaintiff was dishonest and

minimized Chico's risk to Natalie, *during a children's services investigation and the resultant hearing*, even though she herself supervised children's services employees.  Defendants were particularly concerned that Plaintiff minimized or refused to disclose Chico's prior history of domestic violence to Ms. Cole given that Plaintiff knew that that is a critical part of HCJFS' assessment of a caregiver's capacity to protect a child. (Id. at PageID 408).

Plaintiff laments that Defendants are holding her to a different standard than other members of the community, expecting her to speak consistent with her role as a Children's Services Supervisor.  (Doc. 54, Memo. in Opp. at PageID 2488).  The Supreme Court has "consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large. * * * [W]e have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern."  *Waters*, 511 U.S. at 673.  Notably, the *Waters* Court went on to state "[w]e have refrained from intervening in government employer decisions that are based on speech that is of entirely private concern."  *Id.* at 674.

Plaintiff argues that Defendants cannot argue that Plaintiff's dishonesty and poor judgment impeded her duties as a supervisor when they allowed her to continue in that position "except for during a short suspension."  (Doc. 54, Memo. in Opp. at PageID 2488).  Interesting that Plaintiff literally made a federal case out of what she now terms a "short suspension."  Also interesting that the implication is that had Defendants fired her rather than suspended her it would have proven the seriousness of her misconduct.  This argument is ludicrous.  Defendants suspended Plaintiff consistent with the progressive discipline policy in the hope she would make

the changes necessary to remain in her position.  Is it really Plaintiff's position that second and third chances should not be afforded to Defendants' employees?

Equally feckless is Plaintiff's argument that Defendants' offer to demote her proved her misconduct was not serious as the caseworker position "would arguably involve more direct responsibility for the wellbeing of children."  (Id.).  The demotion would have also entailed supervision of Plaintiff's actions, and would have taken her out of a position requiring her to exercise and employ good judgment with regard to all cases of all workers under her supervision.

Plaintiff's claim that the members of the community who expressed concern to Defendants about Plaintiff's Day One Hearing testimony "largely denied doing so" is false. According to Ms. Eck, the assistant prosecuting attorney raised concerns, and this is unrefuted. (Doc. 26, Eck Depo. at PageID 394).  Ms. Lang recalls discussing her concerns with her supervisor Margie Weaver.  (Doc. 43, Lang Depo. at PageID 1525, 1557).  Ms. Cole discussed her concerns with Ms. Eck, also unrefuted.  (Doc. 26, Eck Depo. at PageID 394). The Magistrate made her concerns regarding Plaintiff quite clear.  (Doc. 51-11, Ex. 21 at PageID 2052).

Plaintiff argues that Defendants cannot prove Plaintiff's testimony impeded HCJFS's operation "when others working for the agency shared her opinion**."**  (Doc. 54, Memo. in Opp. at PageID 2489).  Plaintiff was suspended because she minimized and denied her son's violent and out of control behavior on March 1, 2016, as well as previously documented incidents against her and Samantha, and because her failure to recognize the safety threats to her own grandchild created significant concerns for the agency that employed her as a Children's Services Supervisor, as well as calling into question her judgement and ability to adequately assess safety and provide direction and guidance to her staff.  (Doc. 52-15, Ex. 26 at PageID 2247).  Of great significance is the fact that Plaintiff had previously served a five day suspension for lack of

17

judgement and failure to adequately assess a family in May 2015. (Id. at PageID 2224). Magistrate Guenthner clearly did not share Plaintiff's opinion, and neither did Ms. Cole.

Plaintiff argues that the Supreme Court imposes a high burden on HCJFS to prove interference with its operations, but the Supreme Court stated in *Waters v. Churchill* the exact opposite, as cited *infra*. Plaintiff's reliance on *Leary* is equally misplaced as her speech did not "substantially involve matters of public concern", as is required before an employer *may* be required to make a "particularly strong showing" that the employee's speech interfered with workplace functioning. *See Leary*, 228 F.3d at 737-38.

### Suspension and Termination Not Motivated By Plaintiff's Exercise of Constitutional Rights

As Defendants have proven herein, Plaintiff can present no evidence to create a genuine issue of fact that her filing for custody or speech allegedly criticizing HCJFS were substantial or motivating factors in Defendants' decision to suspend her.  She was suspended for dishonesty and failure of good behavior displayed during Ms. Cole's investigation, the Day One Hearing, and her pre-disciplinary hearing. Plaintiff references Ms. Patton's claim of a memorandum Ms. Eck allegedly gave her, as well as Ms. Eck's comments in her performance evaluation, as proof of retaliatory motive. Regarding the alleged memorandum, Defendants' counsel specifically asked Ms. Patton during her deposition to provide this alleged memorandum, she agreed to do so, but never did; it is not in the record.  (Doc. 40, Patton Depo. at PageID 1450-51). Regarding the alleged accusation in Ms. Patton's performance evaluation, there is not one word about Ms. Patton's testimony in that evaluation.  (Doc. 52-18, Ex. 40 at PageID 2284-2294, see PageID 2291).

Regarding her termination, Plaintiff does not even attempt to argue that protected speech motivated the decision. Instead she acknowledges that, pursuant to Defendants' progressive disciplinary policy, termination was the next appropriate action.

**E.  Individually Named Defendants Are Entitled to Qualified Immunity**

Qualified immunity only comes into play if this Court finds that Plaintiff was suspended, or later terminated, for protected speech. The evidence makes clear that Plaintiff was suspended for speech wholly unrelated to anything that could be considered protected. Nonetheless, while the U.S. Supreme Court held in *Lane v. Franks* that the First Amendment protects a public employee who provides *truthful* testimony under oath outside of his ordinary job duties, there is no clearly-established right to lie during an investigation, nor under oath, nor during a pre-disciplinary hearing.

As explained, *supra*, the Sixth Circuit has held that to find qualified immunity the Court need not decide whether the plaintiff knowingly or recklessly made false statements, rather, the Court need only decide whether a reasonable official could believe the plaintiff knowingly or recklessly made false statements. *Gossman*, 950 F.2d at 342.  Defendants believed Plaintiff had made false statements during Ms. Cole's investigation, and/or at the Day One Hearing, and/or during her pre-disciplinary conference, as they reasonably relied on the testimony of an objective investigator, Ms. Cole, as well as the report of an objective Mobile Crisis worker.  Defendants' belief that Plaintiff knowingly made false statements was reasonable, as was their belief that she exercised poor judgment by minimizing and denying her son's violent behavior and danger to Natalie, which poor judgment directly reflected on her ability to perform as a Children's Services Supervisor. Defendants are therefore entitled to qualified immunity.

Plaintiff makes no argument that Defendants are not entitled to qualified immunity for terminating her. Defendants are entitled to qualified immunity as they would have no reason to know that termination consistent with progressive disciplinary policy was a violation of Plaintiff's rights, and the termination was objectively reasonable.

## F.  Plaintiff Was Not Denied Procedural Due Process

Plaintiff argues she was denied procedural due process because the April 2016 notice of pre-disciplinary conference made no reference to infractions other than testimony provided at the Day One Hearing. (Doc. 13, Count 5).  The pre-disciplinary notice makes specific reference to the investigation and the concerns that arose therein regarding Plaintiff's capacity to protect her grandchild, which concerns were repeated at the Day One Hearing. (Doc. 52-5, Ex. 11 at PageID 2167). The notice specifically references Plaintiff's minimization of Chico's violent behavior on March 1 and her belief that Chico did not present a threat to Natalie. (Id.). Well in advance of the hearing Plaintiff's attorney was provided with all evidence Defendants intended to introduce, complete with bright-line notations drawing particular attention to the concerns raised during Ms. Cole's investigation, as reflected in her SACWIS notes.  (Doc.20, Biersack Depo. at PageID 156-157; Doc. 51-10, Ex. 15 at PageID 1973 [see in particular PageID 1977-1980, 1984, 1989, 1991]).

Ms. Cole testified at the conference regarding her concerns about Plaintiff during her investigation, and Plaintiff's attorney never raised an objection that he was not prepared to address them.  (Doc. 52-15, Ex. 26 at PageID 2229-2246; Doc. 52-29, Ex. 41 at PageID 2295 [CD delivered to Chambers with original MSJ]).  Mr. Butler extensively cross-examined, and re-cross-examined, Ms. Cole.  (Doc. 52-15, Ex. 26 at PageID 2232-2233; Doc. 52-29, Ex. 41, PageID 2295 [CD delivered to Chambers with original MSJ).  Plaintiff responded to questions

posed by Mr. Butler and spoke at length about her actions during Ms. Cole's investigation. (Doc. 52-15, Ex. 26 at 2238-2241; Doc. 52-29, Ex. 41, PageID 2295 [CD delivered to Chambers with original MSJ]).

The notice referenced the investigation, the evidence given to Plaintiff's attorney well prior to the hearing drew particular attention to the investigation, and Plaintiff's attorney inquired of witnesses and Plaintiff regarding the investigation. Furthermore, Ms. Cole explained all these issues at the Day One Hearing, which Plaintiff attended. At that hearing Ms. Cole explained her investigation, including all interactions with Plaintiff, particularly those that caused concern. This does not constitute a deprivation of Plaintiff's due process rights, as Plaintiff's opportunity to be heard on infractions arising during the investigation was not impaired. Cf. *Estes v. Texas,* 381 U.S. 532, 542 (1965) ("in most cases involving claims of due process deprivations we require a showing of identifiable prejudice").

## IV. CONCLUSION

For all of the foregoing reasons, and those explained fully in Defendants' Motion for Summary Judgment, Defendant Hamilton County Department of Job and Family Services must be dismissed as a defendant as it is not *sui* juris; claims against Defendant Biersack in his individual capacity must be dismissed under Fed.R.Civ.P. 12(b)(6) for failure to state a claim; and all Defendants are entitled to summary judgment on all of Plaintiff's remaining claims. All such relief must be granted at Plaintiff's cost and expense.

Respectfully submitted,

JOSEPH T. DETERS
PROSECUTING ATTORNEY
HAMILTON COUNTY, OHIO

*/s/ Kathleen H. Bailey*
Kathleen H. Bailey, 0059660

Jerome A. Kunkel, 0039562
Jay Wampler, 0095219
Assistant Prosecuting Attorneys
Hamilton County, Ohio
230 E. Ninth Street, Suite 4000
Cincinnati, OH 45202
DDN:  (513) 946-3289 Bailey
DDN:  (513) 946-3082 Sears
FAX:  (513) 946-3018
TRIAL ATTORNEYS FOR
DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of March, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Kathleen H. Bailey*
Kathleen H. Bailey
Assistant Prosecuting Attorney

541638