IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Candice Baird, | : | Case No. 1:16-cv-759 |
| | : | |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | |
| Hamilton County Department of Job and | : | Order Granting Defendants' Motion for |
| Family Services, *et al.*, | : | Summary Judgment |
| | : | |
| Defendants. | : | |

This matter is before the Court on the Amended Motion for Summary Judgment filed by

Defendants Hamilton County Department of Job and Family Services ("HCJFS"), Moira Weir,

Cheryl Keller, Christopher Biersack, Dennis Deters, Chris Monzel, Todd Portune, and Denise

Driehaus.[1]  (Doc. 53.)  Plaintiff Candice Baird opposes the Motion (Doc. 54), and Defendants

have replied.  (Doc. 55.)  For the reasons that follow, Defendants' Motion will be **GRANTED**.

I.     **BACKGROUND**[2]

   **A. Background Facts**

   This case arises from Plaintiff's discipline and eventual termination from employment

after she testified in a hearing regarding custody of her granddaughter, N.[3]  HCJFS employed

Plaintiff as a Family Services Supervisor until her termination from employment on December

---

[1] Defendants Weir, Keller, and Biersack are sued in their official and individual capacities; Defendants Deters, Monzel, Portune, and Driehaus are sued in their official capacities.  (Doc. 1.)

[2] The Court typically draws its facts from the moving party's statement of undisputed facts and the opposing party's affirmation or denial of those facts.  In this case, Defendants submitted a Joint Statement of Proposed Undisputed Facts (Doc. 53-1), to which Plaintiff filed a Response to Defendants' Proposed Undisputed Facts and Plaintiff's Proposed Disputed Facts (Doc. 54-1).  To the extent a fact is admitted, the Court will draw from the proposed undisputed facts without citing to the record.  To the extent a fact is contested, the Court will directly cite the record.

[3] For the privacy of the minor involved in this case, the Court will refer to the minor child involved as "N." and her parents by their first initials.  *See* Fed. R. C. Pr. 5.2(a).

19, 2017.  In her position, Plaintiff supervised Family Services Workers and made decisions around safety and risk as it pertains to child abuse, neglect, and dependency.

Plaintiff's adult son, C., became the father of a baby girl named N. in 2015.  After her birth, N.'s mother, S., and N. moved in with Plaintiff; C. lives just a few doors down from Plaintiff.   C. suffers from schizoaffective disorder, paranoia, mania and depression, and Plaintiff was his sole provider to assist him with day-to-day activities.  He receives mental health treatment from Greater Cincinnati Behavioral Health Center ("GCBHC") and has been hospitalized multiple times for acute mental health issues in the past.  (Doc. 51-3 at PageID 1704.)

C. has a juvenile criminal history, including 2010 and 2013 domestic violence incidents against Plaintiff, resulting in her calling the police because she was unable to control his violent outbursts.  In addition, other incidents have been documented, although not prosecuted, which involve violence towards S., N.'s mother, since C. has become an adult.

In early December 2015, Neal Connor of GCBH called in a referral to HCJFS due to his concerns with C. possibly having unsupervised contact with N.  (Doc. 51-4, Ex. 3 at PageID 1707, 1751; Doc. 51-6, Ex. 7 at PageID 1819–20.)  On December 11, 2015, Plaintiff and S. filed an Affidavit of Mental Illness with the Hamilton County Probate Court to have C. hospitalized. In this Affidavit, Plaintiff and S. asserted that C. represented a substantial risk of harm to himself and others.  On December 15, 2015, the Probate Court found that C. suffered from mental illness and ordered him probated to Summit Behavior Health Center for inpatient treatment, where he remained until January 11, 2016.

### B. March 1, 2016 Incident and 241-KIDS Referral

On March 1, 2016, a neighbor called Plaintiff about her son. (Doc. 51-6 at PageID 1912.) When Plaintiff called C. to check on him, C. was crying on the phone. (Baird Dep., Doc. 24 at PageID 286.) She then called Mobile Crisis, a psychiatric mobile response team that provides on-site assistance during mental health crises, and went to C.'s home. (Doc. 51-6 at PageID 1799–1800.)

Plaintiff arrived at C.'s apartment before Mobile Crisis and received a call as they were pulling up. (*Id*. at 1915.) She stated that C. was calm, but he could use someone to talk to for a little bit. (Doc. 51-6 at PageID 1915.) C. begged her to stay, but Plaintiff told him that she needed to leave with N. (*Id*. at 1800–01.)

Neil Witsken from Mobile Crisis arrived on the scene and observed Plaintiff at C.'s apartment holding N. He observed C. making suicidal statements. He says it was clear that C. destroyed property, as there were broken wooden pieces strewn all over the apartment/living room. The cable box was on the ground, and the phone had been pulled from the wall and was inoperable. C. was crying and upset. C.'s hand was bleeding, and there were drips of blood on the floor and in the hallway of the building. C. made statements that no one cared for him, and that he would be better off dead. C. had been watching N. during this incident. (Intake Narrative, Doc. 51-3 at PageID 1704.[4])

Witsken called the police to transport C. to the mental hospital. C. refused to be transported or handcuffed, causing police to tase him. Witsken reported the incident to the

---

[4] Baird disputes the accuracy of Witsken's report. She says that C.'s hand was not cut when she arrived at his home, and that C.'s phone was clearly operational because she spoke on the phone with him while driving to his apartment. (Baird Dep., Doc. 24 at PageID 306–07.) Baird also testified that C. was not crying when Mobile Crisis arrived.

HCJFS hotline (241-KIDS) due to his concerns for N.'s safety. Mobile Crisis placed C. on an involuntary hold at Deaconess Hospital. A case worker from HCJFS visited Plaintiff, S., and N. that same evening and instituted a Safety Plan requiring supervision of C. when he was with N. (Doc. 51-4 at PageID 1726–27.) N. was examined the day of the incident and determined to be unharmed. (Doc. 51-3 at PageID 1706.)

## C. Investigation by Cole

In order to avoid a conflict of interest, HCJFS referred the investigation to Montgomery County Jobs and Family Services. On March 4, 2016, Jennie Cole, an intake supervisor at Care House, was assigned to investigate the allegations against C. and to ensure N.'s safety.

Caseworkers entered their notes about the case into a log in the State Automated Child Welfare Information System ("SACWIS"). Cole recorded notes in this system.[5] According to her notes, Cole spoke with Plaintiff over the phone about the incident with her son. Without prompting, Plaintiff stated that she "overreacted" to the incident and she believed the report to be embellished. (Doc. 51-4 at PageID 1728–29.) When she arrived at C.'s home that day, N. was not crying, her diaper was dry, and she was clean and uninjured. The home was not a mess. The WiFi box was on the floor as C. has his home phone hooked up to the internet; C.'s top dresser drawer has always been out of the dresser as he uses that space for his gaming system. When asked if N. had been taken to see a doctor as a result of the incident, Plaintiff responded by

---

[5] Plaintiff disputes the accuracy of these notes because of differing testimony regarding when they were entered, but the Court finds the discrepancy immaterial. Cole testified that she recorded her notes of a March 11, 2016 in-home-visit on that same day, a Friday, or the following Monday but she was "not 100 percent sure." (Cole Dep., Doc. 24 at PageID 494.) She was confident that the entry was created before March 21. (*Id*. at PageID 495.) Defendants' IT specialist testified that the activity start date inputted by the Cole was listed as March 11. However, the activity log date recorded by the computer was March 21, and the last modified date was March 29. (Huesman Dep., Doc. 41 at PageID 1508–09.) But Mary Eck, an assistant clinical director with HCJFS, testified that typically, the OAC requires notes to be entered within seven days, but it allows for longer time. (Eck Dep., Doc. 26 at PageID 399.) She testified that most staff take notes and copy and paste those notes over to SACWIS later. (*Id*. at 402.)

stating, "nothing is wrong with [N.], why would she go to the hospital."  Plaintiff left C.'s home after Mobile Crisis began talking to him and reported that she observed C. being cooperative and not aggressive or combative.  (*Id.*)   Cole wrote: "This supervisor is concerned that the incident/allegations of physical abuse are possibly being minimized by Ms. Baird."  (*Id*. at 1729.)

Cole conducted an in-home visit with S., N., and Plaintiff on March 11, 2016.  Prior to her visit, Cole reviewed the intake information before visiting Baird's home, which included a description of C.'s criminal history.  (Doc. 27 at PageID 498.)  However, she may have missed some of the lines of the description, because she did not realize the extent and severity of the violence until after leaving the meeting.  (*Id*. at 499.)

According to Cole's notes, Cole met Plaintiff at her home and observed Plaintiff taking care of N.  Plaintiff explained that S. and N. live with her and that the March 1 incident was the second time C. had been left alone with N. for two to three hours.  Plaintiff stated that she was not concerned with N. being left unsupervised with C.  (Doc. 51-4 at PageID 1734.)

Plaintiff and Cole then visited C. at his apartment.  When they arrived, the apartment was completely dark and C. was not wearing a shirt.  (*Id.* at 1735.)  Cole observed the top drawer of C.'s dresser was missing and it looked like it had been pulled or broken off.  (*Id*.)  Cole also observed that C. had a cut on his arm.  Cole asked C. about the March 1 incident, and he stated that he got depressed and then mad.  Plaintiff "jumped" into the conversation and stated, "you got depressed and then frustrated."  (*Id*. at 1736.)  Cole stated that she talked to Baird about C.'s history of mental illness.  She claims she asked C. and Plaintiff about any history of domestic violence or substance abuse, and C. and Plaintiff denied it.  (*Id*.; Cole Dep., Doc. 27 at PageID 495–97, 499, 507.)

### D. Emergency Removal of N. from Baird's Home

After meeting with Plaintiff, Cole contacted an Assistant Prosecuting Attorney ("APA") in the Hamilton County Prosecutor's Office and told the APA that she had some concerns. (Cole Dep., Doc. 27 at PageID 499.) The APA informed Cole of C.'s history of domestic violence with S. and Plaintiff. (*Id*. at 500.) Cole claims she did not know about the "severity of the violence" until after the visit and that Baird and C. "adamantly denied any history of domestic violence." (*Id*. at 499.)

That afternoon, Cole called Magistrate Judge Coleman with the Hamilton County Juvenile Court and requested and obtained an *ex parte* order for the emergency removal of N. from the custody of S. at Baird's home. (*Id*. at 501–03, 517–18; Doc. 51-12 at PageID 2070.) N. was removed from the family's care that evening. (Doc. 27 at PageID 524.) The Court scheduled a hearing for Monday, March 14. (Doc. 51-12 at PageID 2070.) Baird then filed a Motion for Emergency Hearing with the juvenile court and petitioned for custody of N. (Doc. 51-11 at PageID 2056–59.)

### E. Juvenile Court Hearing (Day One Hearing)

On March 14, 2016, Chief Magistrate Judge Carla Guenther conducted a hearing on Plaintiff's petition for custody, referred to as a "Day One Hearing." (Doc. 51-6.) Plaintiff testified that Cole never asked her about prior domestic violence incidents during the investigation. (Doc. 51-6 at PageID 1907.) Plaintiff was asked:

> Q: But you indicated that there was no history of violence, correct?
> A: I don't – I indicated that when? I don't – no. No, I did not.
> Q: When you talked with Jennie Cole, you didn't indicate that there was no history of violence that you were aware of?
> A: No. I did not indicate that. I don't know what – you're saying I did not tell her that there's no violence with him.

> Q: What did you tell her?  Did you tell her about the prior incidents?
> A: I've talked – I told about the hospitalizations.  I answered her questions.
> Q: Did you tell her about the prior domestic violence incidents with you?
> A: No, that did not come into conversation.

(Doc. 51-6 at PageID 51-6 at PageID 1907.)  Plaintiff also testified that she had no concerns about the condition of C.'s home on March 1, 2016.  (*Id*. at PageID 1914.)   She described C. as being "calm" by the time she arrived and that "he just said he wanted someone to talk to."  (*Id*.)

When asked whether she had concerns regarding C.'s contact with N., Baird stated: "I believe – I mean, I've been dealing with my son's mental health for a long time now.  I think I can gauge him pretty well.  I see my son every day.  I think–I take all the precautions to make sure that [N.] is safe at all times."  (*Id*. at 1922.)  She also stated that "I wouldn't leave him alone with her, and I am willing to ensure that won't happen again until–"  (*Id*. at 1923.)  When asked, "why were you comfortable with him being–the child being left alone on the 1st, but you're now uncomfortable with him?," Baird answered: "Well, at the–I can't say I was comfortable with it on the 1st.  They are the parents and they can make their decision. . . . Sometimes it's hard for me to gauge working my different jobs and also remembering that's my son and trying to make all the best decisions I can."  (*Id*. at 1923–24.)

Following the Day One Hearing, Magistrate Judge Guenthner issued an Order stating:

> Based upon the evidence presented, the court finds there are reasonable grounds to believe that [N.] was in immediate danger from her surroundings and that her removal was necessary to prevent immediate or threatened physical or emotional harm.  While it is obvious that paternal grandmother cares deeply for her son and granddaughter, it is clear that her minimization of her son's mental illness and propensity for violence make her unable to adequately protect the child at this time.  Both mother and paternal grandmother lack the judgment and protective capacity to ensure that [N.] is safe at all times and that father's contact with the child does not place [N.] at risk for physical or emotional harm.  Paternal grandmother maintained that she over-reacted by calling mobile crisis and

concluded the events of March 1, 2016, were simply the result of a misunderstanding.

(Doc. 51-11 at PageID 2052.)

Cole, the APA, and Donna Lang, a HCJFS supervisor, all raised concerns about Baird's testimony at the Day One Hearing to Mary Eck, Assistant Clinical Director at HCJFS. (Eck Dep., Doc. 26 at PageID 377, 394.) As a result, Eck and Chris Biersack, Labor Relations Manager for Human Resources at HCJFS, held a meeting with Plaintiff to discuss her judgment. (Biersack Dep., Doc. 20 at PageID 127.) Plaintiff recorded this meeting without the knowledge of either Eck or Biersack. (*Id*. at 126.) At that meeting, Plaintiff was offered a demotion, which she refused. (*Id*. at 129–30.)

After the meeting, Eck requested a Pre-Disciplinary Conference for Plaintiff "because she was dishonest while under oath in juvenile court proceedings and failed to recognize the threats that he[r] own grandchild was exposed to when she allowed her son to care for the infant." (Doc. 20 at PageID 131; Doc. 52-4 at PageID 2166.)

### F. Pre-Disciplinary Conference

On April 24, 2016, Plaintiff received a Notice of Pre-Disciplinary Conference. (Doc. 52-5.) A Pre-Disciplinary Hearing was held on May 10, 2016. Biersack and Eck attended, and Plaintiff appeared with counsel. Plaintiff was asked, "Did you in fact discuss [C.]'s specific incidents of violence with Ms. Cole?" and responded, "Yes" and "we discussed the incident in 2010 when he had his first, um, I would say, psychotic episode…" (Pre-Disciplinary Hearing Recording, Doc. 41, Track 3 at approximately 52:00-52:25.[6]) Following the Pre-Disciplinary

---

[6] The Court notes that neither side cited with any particularity the more than 2.5 hours-long Pre-Disciplinary Conference recording in regards to the dispute over how Plaintiff responded to questions about domestic violence and whether she was asked such questions. The Court has taken up the tedious task of reviewing the entirety of this file and has found the relevant testimony. However, it is the parties' burden to identify such evidence.

Hearing, Hearing Officer Patrick A. Southern issued a Pre-Disciplinary Conference Report. He stated Plaintiff asserted that she discussed prior episodes of domestic violence between C. and herself during the visit with Cole on March 11, 2016, but she denied having any discussions with Cole regarding domestic violence while under oath at the Day One Hearing. He found this conduct met the definition of "dishonesty" in that she either perjured herself before the Court or misrepresented facts to the investigator and the Hearing Officer during the interview and Conference. (Doc. 52-15 at PageID 2243–44.) He also found that Plaintiff held herself out as a supervisor with Hamilton County Children Services yet minimized her son's mental illness and propensity for violence. This called into question the "judgment of the employee in question as both a worker and supervisor in the children services arena," undermines the agency, and meets the definition of "failure of good behavior." (*Id*. at PageID 2246.) As a result, Plaintiff was suspended from work for ten days. (*Id*. at PageID 2247.)

### G. Deposition Testimony

At her deposition, Plaintiff testified that Cole failed to ask her about domestic violence:

Question: "Did you tell her, meaning Jennie Cole, about the prior domestic violence incidents with you? And your answer was No, that did not come into conversation.
Plaintiff: 'Cause she never asked me anything about a history of domestic violence. And when we talked about the incidents we talked about, we was talking about his mental health.

(Baird Dep., Doc. 24 at 299–300.) She further testified that violence may have come up in the conversation about C.'s mental health history, but Cole did not specifically ask her about domestic violence. (*Id*. at 303–04.)

### H. Termination from Employment

During discovery, Plaintiff disclosed that she secretly recorded the meeting in April 2016 between Biersack, Eck, and herself. On December 6, 2017, a Pre-Disciplinary Conference was held to give Plaintiff the opportunity to respond to the allegation that she violated Section 6.6(B)(15) of the Hamilton County Personnel Policy Manual prohibiting recording devices in the workplace without permission of all present. Plaintiff admitted she did not seek permission from Eck or Biersack prior to recording the meeting. HCJFS terminated Plaintiff's employment on December 19, 2017 for violating Section 6.6(B)(15) of the Hamilton County Personnel Policy Manual.

### I. Procedural History

Plaintiff filed this action on July 18, 2016. (Doc. 1.) Plaintiff asserts claims for retaliation and procedural due process violation under 42 U.S.C. § 1983. (Doc. 13.) On February 28, 2019, Defendants filed their Amended Motion for Summary Judgment, to which Plaintiff has responded in opposition and Defendants have replied. (Docs. 53–55.)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of showing that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 585–87; *Provenzano*, 663 F.3d at 811.

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III. ANALYSIS[7]

### A. Retaliation

Defendants contend they are entitled to summary judgment on all four of Plaintiff's retaliation claims asserted under 42 U.S.C. § 1983. Plaintiff alleges:

> (1) Defendants retaliated against her for her testimony in juvenile court which violated her First and Fourteenth Amendment rights;
> (2) Defendants retaliated against her for filing a complaint with the juvenile court for the custody of her grandchild, which violated her right to petition the government for redress of grievances under the First and Fourteenth Amendment;
> (3) Defendants HCJFS, Weir, Portune, Monzel, and Driehaus terminated her

---

[7] Defendants raise the preliminary argument that HCJFS is not *sui juris* and cannot be sued. The law on this is well-established, and the Court agrees. Under Ohio law, if a county has adopted a charter or an alternative form of government, it may sue and be sued. Ohio Rev. Code § 301.22. However, absent that, a county may only be sued through its Board of Commissioners. Ohio Rev. Code § 305.12. Hamilton County has not adopted a charter or alternative form of government; thus, it lacks the ability to sue or be sued. *Lowe v. Hamilton County Dept. of Job and Family Serv.*, No. 1:05-cv-117, 2008 WL 816669, at *2 (S.D. Ohio 2008) (adopting report and recommendation finding that neither Hamilton County nor HCJFS to be *sui juris*); *McGuire v. Ameritech Servs., Inc.*, 253 F. Supp. 2d 988, 015 (S.D. Ohio 2003). Accordingly, the claims against HCJFS are dismissed.

employment in retaliation for filing a complaint with juvenile court and for filing this action in violation of the First and Fourteenth Amendment; and (4) Defendants HCJFS, Weir, Portune, Monzel, and Driehaus terminated her employment in retaliation for her testimony in the juvenile court proceeding and for filing this action to protect speech under the First and Fourteenth Amendments.

(Doc. 13.)  To establish a retaliation claim under the First (and Fourteenth) Amendment, Plaintiff must prove: (1) she engaged in a constitutionally protected activity; (2) she suffered an adverse action that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse action was motivated at least in part as a response to the exercise of her constitutional rights.  *Nair v. Oakland Cty. Comm. Mental Health Auth.*, 443 F.3d 469, 478 (6th Cir. 2006).  For the reasons that follow, the Court finds that Plaintiff is unable to meet the first prong of this test–that she engaged in a constitutionally protected activity.

### 1.  Constitutionally Protected Activity

"A public employee alleging First Amendment retaliation must satisfy three requirements."  *Mayhew v. Town of Smyrna, Tenn.*, 856 F.3d 456 (6th Cir. 2017) (quoting *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 337–38 (6th Cir. 2010)).  First, "the employee must speak on 'matters of public concern.'"  *Id*. (citing *Evans-Marshall*, 624 F.3d at 337).  Second, "[t]he employee must speak as a private citizen and not as an employee pursuant to his official duties."  *Id*. (citing *Evans-Marshall*, 624 F.3d at 338.).  Third, "the employee must show that his speech interest outweighs 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'"  *Id*. (citing *Evans-Marshall,* 624 F.3d at 338).  Whether Plaintiff engaged in protected speech is a question of law.  *Nair*, 443 F.3d at 478.  Courts generally apply the same analysis to cases arising under the Petition Clause as to

those arising under the Speech Clause. *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 398–99 (2011).

"Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011), citing *Connick v. Myers,* 461 U.S. 138, 146 (1983), "or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Id*. (citing *San Diego v. Roe*, 543 U.S. 77, 83–84 (2004)). Whether speech is a matter of public concern is determined by the "content, form, and context" of the speech "as revealed by the whole record." *Id*. (citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc*., 472 U.S. 749, 761 (1985)). In so considering, "no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Id*.

The parties dispute whether Plaintiff's petitioning for the custody of her granddaughter and testimony at the Day One Hearing are matters of public concern. Defendants take the position that both were matters of personal concern with no value to the public. The form of the petition for custody was that of a personal lawsuit, and the redress sought was custody of Plaintiff's granddaughter. The testimony at the proceeding was made for the benefit of the Magistrate Judge to make a decision regarding custody, not for purposes of debating by the public. The petition was filed in the context of a personal custody dispute, of which the public has no interest. Plaintiff contends that her petitioning for custody and testifying at the Day One Hearing addressed matters of public concern for two primary reasons: her speech was truthful testimony under oath at a judicial proceeding, and because her speech was critical of government action.

### a. Juvenile Court Hearing

As an initial matter, the fact that Plaintiff testified under oath at a judicial proceeding does not alone render Plaintiff's speech a matter of public concern, as she argues. Although Plaintiff relies upon *Lane v. Franks* for the proposition that truthful testimony under oath in a judicial proceeding by a public employee outside of her ordinary job duties is speech by a citizen on a matter of public concern, the Court certainly still considered the *content* of the speech. 573 U.S. 228 (2014). In *Lane*, a public employee testified compelled by subpoena regarding the events that led to his decision to terminate a former employee. *Id*. at 233. His employment was subsequently terminated, prompting him to file suit for retaliation for exercising his First Amendment rights. *Id*. at 234. The Supreme Court concluded that the content of his testimony, corruption and misuse of state funds, "obviously involves a matter of significant public concern," and "the form and context of the speech–sworn testimony in a judicial proceeding–fortify that conclusion." *Id*. at 241. Here, the content of Plaintiff's speech, custody of her granddaughter, does not similarly implicate an "obvious" public matter.

While comments criticizing misuse of public funds in the context of a state investigation are generally matters of public concern, *Marohnic v. Walker,* 800 F.2d 613, 616 (6th Cir. 1986), internal personnel disputes, even by a public employer, generally are not. *Bagi v. City of Parma, Ohio*, 714 F. App'x 480, 486 (6th Cir. 2017). A public employee's speech does not have to pertain exclusively to matters of public concern, so long as a largely private matter also touches on that of public concern. In *Connick v. Myers*, the Court found that an employee displeased with a transfer decision who circulated a questionnaire to her colleagues engaged in speech touching on matters of public concern, even though only in a limited sense. 461 U.S. 138, 154 (1983). Only one survey question touched on a matter of public concern when it inquired as to

whether employees ever felt pressured to work on a public campaign. *Id.* at 149. Because that question touched upon a matter of public concern and contributed to the employee's discharge, the Court had to proceed with its analysis to determine whether the employee's discharge was justified. *Id.*

Plaintiff identifies three sources of government "criticism" in her testimony. As she explains: first, she accused HCJFS of obtaining custody in violation of Ohio law; second, she appeared at the Day One Hearing as a witness for S. and raised several "significant concerns" with HCJFS's actions with respect to N.'s case and the veracity of testimony of HCJFS's witnesses; and third, Plaintiff accused Cole of providing false testimony. However, the substance of Plaintiff's testimony does not bear out as she describes.

The Court has examined the entire record of this case, and concludes that Plaintiff's testimony at the Day One Hearing concerned personal, not public, matters. As Defendants highlight, the overwhelming majority of Plaintiff's testimony is about personal family affairs, including C.'s mental health and how she provided support as a parent in navigating years of his mental health challenges. She also testified about the events leading to N.'s removal from her mother's custody. Overall, the substance of the testimony reads as a very uniquely personal family narrative.

Although Plaintiff argues that her speech is critical of the government, the Court finds that overall any criticism is muted and sparse, and it is not enough to color the content of the speech as being a matter of public concern. While some testimony conveys frustration with the handling of N.'s case, this testimony is limited and specific to her unique circumstances: "I mean, I don't know what happened from the 1st to the 11th that they would knock on my door at

7:00 at night, not giving us any reason why they're taking the baby out of my home." (Doc. 51-6 at PageID 1927.) She also testified that:

> Again, I mean when they came to – when Ms. Cole left the home on Monday she didn't – she said everything looks good. She was just going to confirm that he's compliant with his services, and then she said I guess I'll have to come back down to Cincinnati to meet with [S.] or maybe I'll just interview her by phone.
> And then no one's–no one called the rest of the day to ask any questions, you know, to get clarification on anything.
> When they showed up at 7:00 at night, they couldn't give us a single reason why they were there. They said they don't know why. And it's just–I mean the Safety Plan was put in place, it was being followed.
> I don't – I didn't see the need for an emergency removal. I don't see the need where [S.] wouldn't have to lose custody of her baby. There's plenty of other families where services are put in place for concerns, but I don't know what the emergency was on Friday.

(*Id.* at PageID 1933–34.) This is not a call to action about how HCJFS handles custody cases, but a complaint or disagreement about how custody was handled in her granddaughter's particular circumstance. In addition, as Defendants have pointed out (and contrary to how Plaintiff represents the law), under Ohio law, an emergency custody order may be granted without notifying the parents, guardian, or custodian of the child if notification would jeopardize the physical or emotional safety of the child at issue. Ohio Rev. Code 2151.31(D).[8] Further, Plaintiff was not the custodian of N. at the time she was removed from her home. Although

---

[8] This section states in relevant part:

> A juvenile judge or referee shall not grant an emergency order by telephone pursuant to this division until after the judge or referee determines that reasonable efforts have been made to notify the parents, guardian, or custodian of the child that the child may be placed into shelter care and of the reasons for placing the child into shelter care, *except that, if the requirement for notification would jeopardize the physical or emotional safety of the child or result in the child being removed from the court's jurisdiction, the judge or referee may issue the order for taking the child into custody and placing the child into shelter care prior to giving notice to the parents, guardian, or custodian of the child.*

Ohio Rev. Code Ann. § 2151.31(D) (emphasis added).

Plaintiff was upset by how her granddaughter's custody was handled, overall, the content of her speech concerns a personal matter, and the limited testimony about N.'s removal does not convert it into a public matter.

The Court has reviewed the broad sixty pages Plaintiff cited in support of her second argument, that she raised "significant concerns" with HCJFS's actions and the veracity of testimony, but it is unclear to what testimony she was referring. Thus, this certainly does not tip the scale in favor of finding that her testimony involves matters of public concern. Lastly, Plaintiff's cross-examination of Cole and "accusing her of providing false testimony" similarly is muted and not a significant portion of the record. Baird cross-examined Cole about prior testimony from Cole in which she stated that N. was not seen by a doctor until March 25, although she had asked S. to take the baby to the doctor earlier. That cross-examination is a very minor portion of the record.

According to Cole, she received a call from Plaintiff who was "upset" about a request that N. be seen by a doctor after the incident with her son and stated they already had an appointment scheduled for March 25. (Doc. 51-6 at PageID 1856.) On cross-examination, Plaintiff asked Cole:

> Q: So you said that [S.] and I refused medical treatment? But wasn't it on the phone you said at the visit you would further explain to [S.] what she needs to – call the doctor's office to say to be seen?
> A: I did explain it to you and [S.] that night when you had me on speakerphone, and you said [S.] was present. The reason for the doctor's visit was because of destruction of property. The threats of self harm and the violence in the home, so I did tell [S.] – you told me she was on speakerphone and she could hear the conversation as well.
> Q: No. My question is: Did you not say that when you came out you would explain to [S.] what she needs to say to the doctor's office for [N.] to be seen? Because you said that if you just call and say that she needs to be seen, they wouldn't see her, and you could explain it further when you came out on Thursday on what she needs to tell them to be seen.

A: Well, I don't want to be difficult. I don't understand the motive of the question. I did explain that [S.] does need to explain to the doctor why the baby needs to be seen, because the doctor wouldn't know if [S.] didn't explain it to them, I did tell you that on Thursday the 10th.

Q: So you were saying that earlier in the week, when we scheduled Thursday's appointment, you did not state that when you came to the home you would explain to [S.] what she needs to explain to the doctor's office?

(Doc. 51-6 at PageID 1861–62.) At this point, the Magistrate Judge sustained an objecting and stated that Cole answered the question to the best of her ability. Plaintiff responded: "Well, I'm just–that was not what was said so I was just trying to–because we have not refused it." (*Id*. at 1862.) Although the Court understands that Plaintiff disagreed with Cole's summary of the situation, the testimony concerns a tangential dispute which concerned N. more than Plaintiff, the facts of which are still somewhat unclear. The testimony does not color the testimony overall or change the Court's conclusion that the testimony concerns a private, not public, matter.

Plaintiff also contends that because Plaintiff's testimony touches on the subject of child welfare and custody that it implicates a matter of public concern. Plaintiff's testimony touches on the welfare of *her* grandchild, but *not* children overall. In addition, the Court is concerned that extending protection to Plaintiff's speech would convert *any* custody dispute into a matter of public concern, and impact *any* employee embroiled in such a custody dispute. In this case, Plaintiff's testimony concerns a personal family matter, not a broader public issue.

Ultimately, the Court must consider "whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Singer v. Ferro*, 711 F.3d 334, 339 (2nd Cir. 2013) (citing *Lewis v. Cowen*, 165 F.3d 154, 163–64 (2nd. Cir), *cert. denied*, 528 U.S. 823 (1999)). The record as a whole compels the conclusion that Plaintiff's speech was calculated to obtain custody, not to debate how HCJFS handles custody cases. Thus, the Court concludes that Plaintiff's speech involves a matter of personal concern.

### b. Petition for Custody

Plaintiff argues that her petition for custody touches on a matter of public concern.  In her petition, she stated twice that "HCJFS filed for Emergency Custody but have not Provided reason."  (Doc. 51-10 at PageID 2007.)  She reiterates: "HCJFS filed for emergency prior to seeking family.  It is in the best interest of [N.] (the child) to be in the care of family particularly who she knows."  (*Id.*)  The content of the speech, much like Plaintiff's testimony, concerns a personal custody matter.  The Court does not find this language to be meaningfully different than the other speech Plaintiff argues was "critical" of the government.  Although the form of the speech is in petitioning the government, the context concerns a private family matter.  In considering the speech as a whole, the Court finds that the speech was intended to address a personal grievance, and not a broader issue.  Thus, this speech, too, falls in the personal, not public, realm.

### c. Employment Lawsuit

Finally, Plaintiff argues that she was retaliated against for filing this lawsuit.  Defendants argue that Plaintiff's including a First Amendment claim in her suit does not transform it into a matter of public concern.  Rather, Plaintiff filed a private suit to redress personal grievances against her employer.  As to context, the speech is not a matter of public concern if it is made solely in furtherance of a personal employer-employee dispute.  Plaintiff did not respond to this substantive argument.

For the reasons asserted above, the substantive allegations do not involve matters of public concern.  Including a First Amendment claim in a lawsuit does not transform it into a matter of public concern.  *Singer v. Ferro*, 711 F.3d 334, 336 (2nd Cir. 2013).  Generally, internal personal disputes and management decisions are matters of private concern, and an

employment dispute brought against a public employer is not inherently protected speech. *Gibson v. Kilpatrick*, 838 F.3d 476, 484 (5th Cir. 2016). Here, Plaintiff's speech was in the form of her lawsuit, and the redress sought is to remedy a personal employment dispute with her employer. Consistent with the law cited herein, the Court finds that Plaintiff's lawsuit in this instance is a matter of private, not personal, concern.

## 2. Qualified Immunity

Because the Court finds no Constitutional violation, it need not proceed further in the analysis or assess the matter of qualified immunity.

## B. Procedural Due Process

Plaintiff alleges that her procedural due process rights were violated by the Notice of Pre-Disciplinary Conference. "[I]n a § 1983 due process claim for deprivation of a property interest, a plaintiff must first show a protected property interest. Only after meeting this requirement can the plaintiff prevail by showing 'that such interest was abridged without appropriate process.'" *McDaniel v. Princeton City Sch. Dist. Bd. of Educ.*, 45 F. App'x 354, 357 (6th Cir. 2002) (citing *Ferencz v. Hairston,* 119 F.3d 1244, 1247 (6th Cir. 1997)). "Thus, Plaintiff's due process claim depends on her having had a property right in continued employment." *Id.* (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538 (1985)). "*Loudermill* established the minimal protections afforded to a public employee in a pretermination proceeding." *Id*. at 358 (citing *Buckner v. City of Highland Park,* 901 F.2d 491, 494 (6th Cir.1990)). "The due process clause requires that, prior to termination, a public employee, with a property interest in his or her public employment, be given oral or written notice of the charges against him or her, an explanation of the employer's evidence, and an opportunity to present his or her side of the story to the

employer." *Id.* (citing *Buckner*). There is no dispute that Plaintiff had a property interest in her continued employment. Rather, Defendants argue that Plaintiff was provided adequate written notice of the charges against her and thus no due process violation occurred.

In *McDaniel*, the Sixth Circuit reversed the district court and found that the plaintiff teacher was not given sufficient written notice of the charges against her to allow her to respond to those charges prior to her termination from employment. *Id*. Specifically, a notice was sent to Plaintiff mentioning a general charge of "neglect of duty," listing specific charges of "attendance pattern," "failure to remain in classroom," and "excessive personal calls on work time." *Id.* At her pre-disciplinary hearing, Plaintiff responded to those charges. *Id.* However, she was discharged for a "pattern of neglect of duty" that included specific charges that she lacked lesson plans, lacked student behavior plans, and inappropriately disciplined students, none of which were mentioned in the notice sent to her. *Id*. The Court emphasized that the "chance to be heard, to present one's side of the story, is a fundamental requirement of any fair procedural system" and "the opportunity to respond must be a meaningful opportunity to prevent the deprivation from occurring." *Id*. (citing *Buckner*, 901 F.2d at 495). The Court found that the notice sent to plaintiff deprived her of the opportunity to respond to the charges upon which her termination was based. *Id*. at 358–59.

Plaintiff claims that her Pre-Disciplinary Conference Notice stated she may be disciplined for her testimony at juvenile court, but did not include that she may be disciplined for providing false information to an investigator or because of her statements at the Pre-Disciplinary Conference. The Notice of Pre-Disciplinary Conference references the investigation as follows: "HCJFS requested that Montgomery Co. Children's Services complete a full assessment and investigation" and that through the course of that investigation "assessed

that there were concerns with your capacity to protect your infant grandchild." (Doc. 52-5.at

PageID 2167.) The Notice further states:

> You were observed to testify in juvenile court proceedings that you did not believe that your son posed a threat to the child. You minimized and denied his violent and out of control behavior during the 3/1/16 incident and during previously documented incidents toward you and the child's mother. Additionally, you testified that you were confused about why you had your son probated to a local mental health hospital where he was held for 30 days in December. The father's mental health treatment team reported that they did not feel that he should ever be left unattended with the child. Various community professionals voiced concerns about your testimony. They felt that you were dishonest and they were concerned about your lack of judgement [*sic*] and how this impacts your decision making in day to day supervision and consultation. Your failure to recognize the safety threats to your own grandchild creates significant concerns for the agency that employs you as a Children Services Supervisor. Furthermore, it calls into question your judgment and ability to adequately assess safety and provide direction and guidance to your staff.

(*Id*.) In summarizing, the Notice provides: "Your actions with regard to this matter violate

Children's Services Policy and constitutes Dishonesty, Neglect of Duty, Inefficiency and Failure

of Good Behavior, per section 7.1 of the Hamilton County Personnel Policy Manual." (*Id*.)

The Court finds that the Notice of Pre-Disciplinary Conference provides adequate notice

to Plaintiff sufficient for her to be informed of and respond to the charges against her. Although

the Notice does not explicitly state that her employer may consider adverse action based upon

her conversation with Cole, the crux of the concerns about her testimony in court were as they

were juxtaposed to the statements she gave to Cole during the investigation. How Plaintiff

resolved those discrepancies at her Pre-Disciplinary Conference would naturally factor into her

employer's decision. In addition, prior to the Pre-Disciplinary Conference, Plaintiff's attorney

was provided with all evidence Defendants intended to introduce, including the SACWIS notes

from Cole's investigation. (Biersack Dep., Doc. 20 at PageID 156–57; Doc. 51-10 at PageID

1973.) Defendants assert that Cole testified at the Pre-Disciplinary Conference regarding her

concerns about Plaintiff during the investigation, and Plaintiff's counsel did not raise an objection that he was unprepared to address those concerns, but instead was able to cross-examine Cole. At the Pre-Disciplinary Conference, Plaintiff made contradictory statements to Cole regarding C.'s history of domestic violence.

The Court is satisfied that the Notice of Pre-Disciplinary Conference adequately informed Plaintiff of the behavior with which her employer was concerned and could base discipline upon and provided her with a meaningful opportunity to prevent the deprivation from happening. The exhibits provided in advance of the Pre-Disciplinary Conference, ability to cross-examine witnesses, and ability to object to any subject being raised, cement the conclusion that Plaintiff was adequately informed and prepared, and thus not deprived of procedural due process. As such, Defendants are entitled to summary judgment on this claim.

## IV.    CONCLUSION

For the reasons set forth herein, Defendants' Motion for Summary Judgment is **GRANTED**. The case shall be dismissed from the docket of the Court.

**IT IS SO ORDERED.**

S/Susan J. Dlott
Judge Susan J. Dlott
United States District Court